### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **TERRIE STEWART,** | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION FILE NO.** |
| | ) | _____ |
| v. | ) | |
| | ) | |
| **HUB GROUP TRUCKING, INC.,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff Terrie Stewart ("Plaintiff" or "Ms. Stewart") and files this Complaint against Hub Group Trucking, Inc. ("Defendant" or the "company") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). She also brings claims for intentional infliction of emotional distress ("IIED") and negligent supervision under Georgia law.

Defendant, Ms. Stewart's former employer, allowed a working environment to persist wherein sexual harassment was treated with virtual impunity. As a result, Ms. Stewart (as well as other female coworkers) were suffered to endure nearly constant acts of flagrant sexual harassment by a group of coworkers. On multiple occasions, Ms. Stewart notified both her own direct supervisor and the company's human resources department of these issues, but the actions that the company took in response were ineffective, and the harassment continued. As a result, Ms. Stewart

has suffered considerable emotional distress and has been diagnosed with Generalized Anxiety Disorder ("GAD"), Post Traumatic Stress Disorder ("PTSD"), and Depressive Disorder as a direct result of Defendant's actions. Then, after over a year of consternation in the workplace due to Defendant's actions, Defendant imposed new conditions upon Plaintiff's continued employment with which it knew she would not be able to comply in order to obfuscate its real reason for its eventual termination of her employment: it no longer wished to hear her complaints of harassment and take appropriate corrective action in response.

## JURISDICTION AND VENUE

1.

This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and of her state law claims pursuant to 28 U.S.C. § 1367.

2.

Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ADMINISTRATIVE PREREQUISITES

3.

Plaintiff has exhausted all administrative requirements necessary to bring these claims. Plaintiff filed an EEOC charge related to her Title VII claims in this

case on August 12, 2020.  The EEOC issued its Notice of Right to Sue on May 27, 2021.

4.

This action is timely filed as less than 90 days have passed since Plaintiff's receipt of the Notice of Right to Sue.

## PARTIES

5.

Plaintiff is a former employee of Defendant who worked for it as a truck driver and front gate operator from April 2017 until April 2021.

6.

Defendant is a domestic for-profit corporation doing business in Austell, GA.  It is a subsidiary of Hub Group, Inc., a major transportation management company in the United States that offers intermodal, truck brokerage, and logistics services.  Defendant provides drayage services for Hub Group, Inc.'s customers.  At all times relevant to this action, Defendant has employed more than 15 employees.

## STATEMENT OF FACTS

7.

Defendant hired Plaintiff in April 2017 to perform work as a Company Driver and occasionally as a front gate operator.  Her job duties primarily consisted in transporting various types of freight for Defendant's clients.  Her supervisors were

Ty Wright and Leslie Halaby-Moore, who were the Driver Manager and Terminal Manager for Defendant's Austell, GA operation, respectively.

8.

Beginning around November 2019, a group of other employees at Defendant's Austell, GA location began to harass, demean, mock, and belittle Plaintiff, the bulk of their actions having overt sexual overtones.  The primary culprits were Jason Grimm, Leticia Dorsey, and Steve Sneed.  All three of these individuals were Plaintiff's coworkers, having no supervisory authority over her whatsoever.

9.

Beginning in June 2020, Plaintiff began seeing a mental health professional for treatment of the emotional injuries that she suffered during her employment with Defendant, and in the course of this treatment, she was diagnosed with GAD, PTSD, and Depressive Disorder.

10.

Around this time, the three above individuals began spreading a vicious rumors about Plaintiff that she was engaging in sexual activity with other people on site in the guard shack.  They repeated this rumor and often laughed in her face about it.

11.

Jason Grimm was particularly menacing towards Plaintiff, often abandoning his job duties to follow her around the worksite and leer at her in a provocative and

threatening manner. On one occasion, he even followed her off the worksite in his personal vehicle as she left work.

12.

On several occasions, during the small hours of the morning, when Plaintiff and Grimm were the only two people in the worksite office, Grimm watched pornography on a company computer with the volume on just a few feet away from Plaintiff, despite her requests that he stop.

13.

In January 2020, Plaintiff confronted Grimm about his inappropriate and harmful behavior. When this did not work, Plaintiff again confronted Grimm the next month, but this time she threatened to report him to human resources if he persisted in his harassment.

14.

In what appears to be some sort of preemptive move, Grimm reported to Ty Wright that it was in fact Ms. Stewart that was harassing him. Wright then called a meeting between himself, Plaintiff, and Halaby-Moore to address the issue. During this meeting, Plaintiff corrected their mistaken understanding about her situation with Grimm, detailing his inappropriate behavior and how it was affecting her. She also used this meeting as an opportunity to discuss Dorsey's harassing behavior, particularly with regard to the rumors that she had been spreading about Plaintiff.

**15.**

Following this meeting, Grimm's harassment continued, but he did make obvious efforts to make his harassment less public. In private, he continued to watch pornography when the two were alone and leer menacingly at her in a blatantly intimidating manner.

**16.**

Dorsey's behavior continued unabated following this meeting. She continued to spread insidious rumors about Plaintiff that she was performing sex acts with various persons while on the job. Also, around this time, she began to perform another cruel joke where, after Plaintiff exited the restroom, she would go into it and spray it down with disinfectant.

**17.**

Steve Sneed also publicly harassed Plaintiff while on the job. Sneed was known to the company's management as a predatory man who regularly made inappropriate, unwanted sexual advances towards female coworkers. On one occasion, Sneed was training another employee named JaKenya Kilgore, who happened to be wearing a dress on that day. He instructed her to get up on a trailer in such a way that he could see up the dress. Sneed then made comments like, "bend over", "work it", and "get into it." Kilgore reported this behavior to the company and eventually resigned because of it.

**18.**

Sneed also sexually harassed another female Hub Group employee named Myrna Mason. Despite numerous rebuffs to Sneed's sexual advances, he persisted in attempting to get Mason to go on dates with him. Several co-workers reported that his behavior made them uncomfortable. Because Mason would not go out with him, Sneed attempted to get her fired by placing a liquor bottle in the cab of the truck that she had been driving.

**19.**

On one occasion, Sneed bent towards Plaintiff as she walked by and sniffed her in an ostentatious manner. This incident was documented by Defendant's human resources department.

**20.**

On another occasion, Sneed let down his pants and began parading around the office, asking Ms. Stewart, "This is how you like your men, right? With their pants down?" This behavior was also recorded by the company's human resources department and corroborated by other employees.

**21.**

On or about May 4, Plaintiff lodged another compliant about the behavior of these three individuals, this time to human resources representative Rashida Williams.

**22.**

Williams launched a human resources investigation into the matter wherein Defendant verified nearly all of Stewart's complaints about Grimm's, Dorsey's, and Sneed's behavior, including the now well-circulated rumor about Stewart's sexual acts at work, the sniffing incident, and the incident in which Sneed pulled his pants down and taunted her.

**23.**

Williams's inquiry into the matter took 74 days to complete, during which time she continued to suffer harassment by all three of the individuals.

**24.**

Williams told Plaintiff throughout the investigation that she would not be allowed to terminate or take any real disciplinary measures against any of the individuals unless there were eyewitnesses.  Though the investigation turned up several eyewitnesses to multiple instances of harassment, none of the responsible parties were terminated and Plaintiff continued to see each of them on a regular basis.

**25.**

Even following the investigation, Dorsey and Grimm would give her "death stares" and say things like, "There's the bitch that lied to HR," and, "You lied. We're still here," to her.  Sneed would leer at her and make a sexually provocative "Mmm" noise on several occasions.

26.

Around this time, Don Lee, a Driver Manager and a close friend of Dorsey, began attempting to intimidate Plaintiff because of her interactions with human resources. He berated Plaintiff after she corrected him to Halaby Moore about a scheduling mistake that he had made, and on one occasion, he drove his car directly at Plaintiff as if he was going to run her over. She reported this behavior to Halaby Moore.

27.

Around late summer 2020, another man employed by Defendant named Charlie Jordan heard that a newly hired driver named Demmetia Blalock had been sexually harassed by Steve Sneed as well. He put Blalock in contact with Plaintiff, knowing that they had had similar experiences, with the notion that they may have been able to assist each other. Blalock and Plaintiff discussed their various experiences with sexual harassment at some length.

28.

When Defendant found out that the two women had been discussing these matters, it removed Plaintiff from the shipping yard for a month, causing her to incur over a 40% pay cut during that time. The company's own stated reason for this demotion was that she had engaged in these discussions with Blalock.[1]

---

[1] Blalock subsequently denied having had these conversations with Plaintiff, likely because she feared the same sort of reprisal that Plaintiff suffered.

29.

By the end of 2020, Plaintiff was regularly having panic attacks, frequently had episodes in which she was crying uncontrollably, and had difficulty performing simple day-to-day activities.

30.

By December 2020, Ms. Stewart felt that she could no longer endure the harassment by her coworkers. Accordingly, she requested and applied for leave under the Family Medical Leave Act ("FMLA") to recuperate and seek treatment for the emotional trauma that she had endured for over a year.

31.

Defendant then gave her an FMLA request form to be filled out by Toni Bryant, her mental health provider at the time. Bryant recommended that Plaintiff take a six-month leave of absence from the company, during which time she was to receive therapy and hone her coping skills.

32.

Defendant, however, did not grant that request and demanded that she return to work in March.

33.

Accordingly, out of fear of losing her job, on March 8, Plaintiff sought and obtained a release from her mental health provider for her to return to work and to operate commercial motor vehicles. However, when she arrived to work for what

she believed would be her first day back, she was told that her provider had not sent over the appropriate clearance paperwork yet and that she could not return.

34.

Once the clearance paperwork was sorted out, her Driver Manager gave her a date to return in April. However, just two days prior this date, human resources manager Cynthia Lee told her that she would no longer be able to work night shifts as she had for the last three and a half years. Instead, she stated that the only shifts that Ms. Stewart would be permitted to work were shifts that began 6:00 am. Plaintiff was unable to do so because she attended classes during the day, a fact that Defendant knew. She asked whether she could work any of the multiple other shifts that began after noon, but was told, "No."

35.

At that point, Plaintiff asked Cynthia Lee if it was her intent to say that she was being fired if she could not work at 6:00 am, to which she said something to the effect of, "No, give me a few days to think about it."

36.

Thereafter, the trauma that she had previously experienced was retriggered, causing Plaintiff to have a panic attack, and she suffered a major setback in her treatment, so she went to see Tikki Brown, another mental health professional at the same treatment center. Ms. Brown advised that because of this setback, she would need to remain out of work for the original full sixth months of treatment until June,

as originally planned and requested. Ms. Brown provided a note to for her employer containing this request.

**37.**

Plaintiff then attempted to give the note to Halaby-Moore, explaining her need for additional time off in order to receive treatment, but she refused to accept it.

**38.**

Later that same day, Plaintiff received an email from Lee, informing her that she was being terminated.

**39.**

This retaliatory and discriminatory termination has exacerbated Plaintiff's already significant mental health issues that she suffers as a result of Defendant's conduct.[2] Moreover, Defendant refused to provide the accommodation Plaintiff request of leave for her disabilities and demanded that she work the 6:00 AM shift and did not clarify for her whether if she refused to work the 6:00 AM shift, she would be terminated.

---

[2] Defendant's action also give rise to claims under the ADA for failure to accommodate and unlawful termination. Following the issuance of NRTS from the EEOC regarding these claims, this complaint may be amended or a separate action filed regarding the same.

## COUNT I
## DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

*Discrimination/Harassment/Hostile Work Environment*

**40.**

Plaintiff incorporates by reference the prior paragraphs of this complaint as if fully set forth herein.

**41.**

As a woman, Plaintiff is a member of a recognized protected class for purposes of Title VII.

**42.**

Plaintiff was subjected to unwelcome sexual harassment by multiple of her coworkers.

**43.**

The harassment that Plaintiff suffered at the hands of these individuals was so severe and pervasive as to create a hostile working environment.

**44.**

Defendant was on notice, both through its knowledge of the tendencies of the offending employees, and through direct reports by Plaintiff herself, that she was suffering such harassment, and it failed to take appropriate corrective action to prevent it and stop it.

**45.**

Even if Defendant did not have notice of all of the harassment that Plaintiff suffered, which it did, it reasonably should have been on notice of it.

**46.**

Plaintiff has suffered severe emotional distress as a result of Defendant's actions.

**47.**

Plaintiff is entitled to all damages permitted by law, including but not limited to, compensatory damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

**48.**

Plaintiff incorporates by reference the prior paragraphs of this complaint as if fully set forth herein.

**49.**

Plaintiff engaged in Title VII protected activity, including communicating with coworkers regarding workplace harassment and complaining on numerous occasions about the harassment that she suffered.

**50.**

Defendant took adverse actions against Plaintiff in demoting her for a month in 2020, demanding that she work the 6:00 AM day shift, not telling her that she would be terminated if she could not (or give her the opportunity to decide whether she would), and by terminating her employment.

**51.**

Defendant's termination of her was because of her persistent complaints of sexual harassment (and a refusal to provide accommodations).

**52.**

Plaintiff is entitled to all damages permitted by law, including but not limited to, compensatory and punitive damages, back pay, front pay, and attorneys' fees and costs.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**53.**

Plaintiff incorporates by reference the prior paragraphs of this complaint as if fully set forth herein.

**54.**

Georgia law prohibits the intentional infliction of severe emotional distress upon other persons.

**55.**

Defendant, through its employees, intentionally inflicted severe emotional distress upon Plaintiff during the course of her employment.

**56.**

Defendant's conduct, through that of its employees, was extreme and outrageous.

**57.**

Plaintiff suffered severe emotional distress as a direct result of Defendant's conduct.

**58.**

Plaintiff seeks all damages arising from the emotional distress she experienced, including but not limited to damages for said distress, compensatory damages, punitive damages, and attorneys' fees and costs.

## COUNT IV
## NEGLIGENT SUPERVISION

**59.**

Plaintiff incorporates by reference the prior paragraphs of this complaint as if fully set forth herein.

**60.**

The employees who harassed Plaintiff had established and known tendencies to engage in harmful, sexually harassing behavior.

**61.**

Defendant knew or reasonably should have known of these employees' tendencies to engage in this type of behavior.

**62.**

It was this exact sort of behavior that is relevant to the injuries that Plaintiff suffered during her employment.

**63.**

All of the harassing employees were acting within the scope of their employment in all instances in which they acted injuriously towards Plaintiff.

**64.**

Plaintiff seeks all damages arising from the emotional distress she experienced, including but not limited to damages for said distress, compensatory damages, punitive damages, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff respectfully requests judgment in its favor on each count in this Complaint and demands:

(a)   That judgment be awarded for and in favor of Plaintiff Terrie Stewart and against Defendant Hub Group Trucking, Inc. on Counts I & II for all relief allowable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*;

(b)   That judgment be awarded for and in favor of Plaintiff Terrie Stewart

and against Defendant Hub Group Trucking, Inc. on Count III for all relief allowable under Georgia law for intentional/negligent infliction of emotional distress.

(c)   That judgment be awarded for and in favor of Plaintiff Terrie Stewart and against Defendant Hub Group Trucking, Inc. on Count IV for all relief allowable under Georgia law for negligent supervision;

(d)   Any and all other relief as the Court deems just and proper.

This 24th day of August 2021.

                                                         /s/ James M. McCabe
                                                 James M. McCabe
                                                 Georgia Bar No. 724618
                                                 Graham White
                                                 Georgia Bar No. 535538
                                                 The McCabe Law Firm, LLC
                                                 3355 Lenox Road
                                                 Suite 750
                                                 Atlanta, GA  30326
                                                 Office: (404) 250-3233
                                                 Fax: (404) 400-1724
                                                 jim@mccabe-lawfirm.com

                                                 Attorneys for Plaintiff